# Exhibit P-8

**Cited pages to Dr. May's 30(b)(6) testimony**

**30(b)(6) Dr. David May**
**February 26, 2026**

```
                                                              Page 1
                    IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF NEW JERSEY



                                          Civil Action

                                          No. 1:25-cv-13094-CPO-MJS

                                          Jury Trial Demanded


     *********************************

CHRISTINA ROMANO,

                  Plaintiff

v.

KENNEDY UNIVERSITY HOSPITAL, INC.,

d/b/a JEFFERSON HEALTH NEW JERSEY

                  Defendant

     *********************************


        30(b)(6) DEPOSITION OF: KENNEDY UNIVERSITY HOSPITAL,
           INC., d/b/a JEFFERSON HEALTH NEW JERSEY
                       BY: DR. DAVID MAY
                    APPEARING REMOTELY FROM
                   Philadelphia, Pennsylvania
                 February 26, 2026      11:17 a.m.




By Daniel Kramer

Guardian

APPEARING REMOTELY FROM LANCASTER COUNTY, PENNSYLVANIA
```

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 15

MR. KRESGE:  I don't -- that's just beyond the scope of this notice again, but go ahead.

A.    Thomas Jefferson University.

Q.    **Is that Thomas Jefferson University, Inc.?**

A.    No.

Q.    **When you say "Thomas Jefferson University," what entity are you referring to?**

A.    That is the entity I'm referring to, the entity called Thomas Jefferson University.

Q.    **Is that also known as "the Enterprise"?**

A.    You could theoretically interchange those, yes.  That is the overarching company for Thomas Jefferson University.

Q.    **Do you have the authority to speak for JNJ on the topics -- in the topics for examination?**

A.    Yes.

Q.    **Do you understand what it means to serve as a corporate designee?**

A.    Yes.

Q.    **What is your understanding?**

A.    That I will be the representative for Jefferson Health New Jersey regarding this matter.

Q.    **Do you understand that your testimony today represents JNJ's knowledge and position on these topics for examination?**

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 19

telling you?

A.    Just his recollections regarding Christina's employment and her involvement in the grant.

Q.    **Do you remember anything more specific?**

A.    That he had no recollection of her raising concerns regarding the grant and that he was not involved in her -- you know, her employment in New Jersey and had no authority over her employment in New Jersey.

Q.    **Have you told us everything that you remember about your conversation with Mr. McBee?**

A.    I'm sure there was more during the conversation.

Q.    **But have you told us everything that you remember about the conversation?**

A.    At least right now that I can recall and recollect for you, yes.

Q.    **Which entity employed Mr. McBee?**

A.    Thomas Jefferson University.

Q.    **The Enterprise?**

A.    Correct.

Q.    **You also said you spoke with Bridget Feery. When did you speak with her?**

A.    Yesterday afternoon as well.

Q.    **About how long did you speak with Ms. Feery?**

A.    Similar: 15, 20 minutes.

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 22

Health is a subsidiary of Thomas Jefferson University.

Q.    Okay.  Thanks for clarifying.

A.    You're welcome.

Q.    Does JNJ and the -- I'm going to refer to it as "the Enterprise" -- and the Enterprise, do they share human resources personnel?

A.    Share?  No.  They are separate personnel for TJU versus Jefferson Health New Jersey.

Q.    How about legal department?  Do they share a legal department?

A.    The legal department are employed by TJU. There are designated folks that work for Kennedy in New Jersey.

Q.    And when you say "TJU," are you referring to the Enterprise?

A.    Yes.  There are -- those individuals that are employed by TJU.

Q.    All right.  I'll try to stick with your terminology, then, and refer to it as "TJU."

A.    I just think it's clearer that way, yes.

Q.    All right.  Does JNJ and TJU -- strike that. Do JNJ and TJU share policies, such as anti-discrimination, FMLA and whistleblower policies?

A.    There are some policies that are Enterprise-wide for all of the Jefferson entities.  So if

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 23

they are an Enterprise policy, like our code of conduct or discrimination, then they are also a Kennedy in New Jersey policy as well.

Q.    I'm going to share my screen again and show you what will be Exhibit P2.  And I'll represent to you this was produced by JNJ in this case.  It's a Family and Medical Leave, FMLA, New Jersey Family Leave, NJFLA, New Jersey Safe Act Policy 200.63, and it's Bates stamped D0001 to D00012.  Are you familiar with this policy?

(Exhibit P2, introduced)

A.    Yes.

Q.    Is this an Enterprise-wide policy?

A.    Not precisely, because it's more specific to New Jersey.

Q.    Next, I'll show you what will be Exhibit P3, Non-Discrimination, Anti-Harassment, Anti-retaliation and Reasonable Accommodation Policy 200.79.  And it's Bates stamped D00013 to D0016.  Is this an Enterprise-wide policy?

(Exhibit P3, introduced)

A.    Yes.

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 24

Q.    Now, I'll show you what will be Exhibit P4, Policy on Equal Employment Opportunity and Diversity 200.90, Bates stamped D00017 to D0019.  Is this an Enterprise-wide policy?

(Exhibit P4, introduced)

A.    Yes.

Q.    Next, I'll show you Exhibit P5, and this is Jefferson's Code of Conduct and Ethical Behavior, Bates stamped D00020 to D0038.  Is this an Enterprise-wide policy?

(Exhibit P5, introduced)

A.    Yes.

Q.    Next, I'll show you Exhibit P6.  This is another Jefferson code of conduct and ethical behavior policy, Bates stamped D0039 to D00093.  Is this an Enterprise-wide policy?

(Exhibit P6, introduced)

A.    That appears to be a slide deck about the code of conduct.

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 25

Q.    Okay.  You know what, I was going to ask you what the differences between P5, that we looked at, and P6. So P6 is just -- it's slides of P5; is that accurate?

A.    Essentially, yes.

Q.    Okay.  And I'm happy to scroll through.  I just --

A.    Yep.

Q.    -- I wasn't sure, so I was going to ask you about that.  All right.  Next, I'll show you Exhibit P7, which is Policy on Legal Holds 127.45, Bates stamped D00231 to D00234.  Is this an Enterprise-wide policy?

(Exhibit P7, introduced)

A.    Yes.

Q.    And when we say "Enterprise-wide policy," Enterprise-wide policies apply to all TJU employees and JNJ employees; is that accurate?

A.    Yes.

Q.    And you know Christina Romano, right?

A.    Yes.

Q.    When did you first meet Christina?

A.    I don't recall exactly, but I'm sure it was after I became employed in December of 2021.

Q.    At some point, Christina reported to you?

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 76

Q.    The second paragraph, Maribeth mentions -- she asked for a job description for Christina and Guiseppa.  Do you know why Maribeth was asking for these job descriptions?

A.    I think it would be in her new role.  She would want to be aware of the job descriptions of the people that are reporting to her.  But it's also to see if those job descriptions align with other jobs in the division, other jobs in the Enterprise.  We're -- it's a fact-finding mission to identify the various components of the existing positions that Christina and Guiseppa held currently.

Q.    And then in the third paragraph, Maribeth mentions a GS manager position.  Do you know what that refers to?

A.    Guest services manager.

Q.    Was that a position that existed on June 5th?

A.    No.

Q.    Was that a position that JNJ was looking to create?

A.    At this point, we were still discussing what roles we would utilize in the future.  Currently, the only roles that existed at the -- at that time upon Christina's return, was her existing position and Guiseppa's existing position.

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 81

Hill.

Q.    And then scrolling up to the top of this exhibit, Bridget e-mails Maribeth, you, and copying Heather on June 10th and says, "Good morning.  I'm in CH if you need me.  I think as far as" -- it says "jon," I think that should be "job titles are concerned.  We need to push on the enterprise so that we are aligned."  Does the -- the Enterprise, is that -- that's TJU, right?

A.    I'm assuming based on that usage, yes.

Q.    Was --

A.    That we would want to align job titles with other structures, but we're talking about future states. We're not talking about Monday's job title.  We're talking about future state changes that may or may not occur.

Q.    But it's referring to potential changes to Christina's job title, correct?

A.    It's referring to the entire department. There are multiple types of jobs in that department that may stay the same or may change in the future.  None of it had been decided, delineated, finalized.  At the time of her return on the 10th, her job title remained the same and her job responsibilities remained the same, and that's the conversation I had with her on her return.

Q.    Okay.  But it seems like there was discussion that her job title might change; is that accurate?

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 85

developing a job description," right?

A.    A future state possibility, yes.  There was no new job description say the reporting structure at this time.

Q.    And then under these, the first set of bullet points, we have, "MB, you can discuss the new role as best as you have defined it at this point.  Describe your vision.  Job description not fully vetted yet."  Did I read that correctly?

A.    Yes.

Q.    "Title not yet finalized, work be done at the Enterprise level."  Did I read that correctly?

A.    Yes.

Q.    Where -- and then if we go down a few bullet points, it says, "Where she'd be located now and in future."  Did I read that correctly?

A.    Yes.

Q.    All right.  I'm going to show you Exhibit P18, and these are e-mails Bates stamped D00460 to D00461.  All right.  We're at the end of these e-mails.  I'll just scroll up to the first one in the chain, and it's from you to Christina on June 10.  Have you had a chance to review these e-mails?

(Exhibit P18, introduced)

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 89

which we've gone over a number of times now, including the front desk and guest services and complaints and pastoral services and volunteer services.

We reiterated all of the things that we expected her to engage with. And it was a difficult conversation because instead of sort of discussing this with us and understanding the -- what we're trying to convey and what we're trying to ask and present to her, she continued to be resistant and only state that she had no job and had no responsibilities.

Q. **Have you told us everything you remember about the June 13th meeting?**

A. Yes.

Q. **All right. I'm going to show you what will be Exhibit P19, and these are e-mails Bates stamped D00540 to D00545. All right. Have you had a chance to review P19?**

(Exhibit P19, introduced)

A. Yes.

Q. **All right. So we'll start here at the bottom. On June 12, 2024, Christina e-mailed Bridget Feery and copied Lisa Satteson. What is -- who is Lisa Satteson?**

A. She's no longer with Jefferson, but she was a TJU or Enterprise-level human resources executive.

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 106

conversations with her and our position that we had wanted her to stay.

Q.    Did either of them reach out to Christina to clarify her role?  And this is --

A.    It had already -- go ahead.

Q.    Sorry.  I just want to clarify the time.  Just between June 14th and July 19th.

A.    No.  But the e-mails described the process that we had already been through clarifying her role, which had been unchanged.  So our position that her role was unchanged was also unchanged.  We had had conversations with her during the week of her return, and our position that her role had not changed did not change.

Q.    All right.  I'm going to show you we'll mark as Exhibit P22, and these are e-mails Bates stamped D00225 to -- wait, did I say 225?  I meant 525 to D00526.  And the bottom e-mail is just the e-mail we just looked at in P21, Christina's resignation e-mail.  And then at the top, you forwarded Christina's resignation e-mail to Dwight McBee on June 14th, "FYI."  Why did you forward Christina's resignation to Dwight McBee?

        (Exhibit P22, introduced)

A.    Just for his awareness since he was the TJU

**30(b)(6) Dr. David May**
**February 26, 2026**

Page 107

Enterprise patient experience chief.

Q.    Did Dwight McBee have any authority over Christina's job?

A.    No.

Q.    Did Dwight McBee ever have authority over Christina Romano's job?

A.    No.

Q.    Did JNJ hire someone to fill Christina's position?

A.    Eventually.

Q.    When is -- when was that?

A.    I don't think I have dates for that in front of me.

Q.    How soon after July 19, 2024, was someone hired to fill Christina's position?

A.    I would be guessing without that detail available.

Q.    Was it in 2024?  Was it the same year?

A.    I would have to get that.  I don't have that off the top of my head.

Q.    Was there a job requisition form or a job requisition that was created?

A.    Any time we fill a position, there has to be a job requisition, but I don't have that available now (phonetic).